United States District Court
Southern District of Texas
**ENTERED**
November 14, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

RUBEN S. MUNOZ,        §
       §
       Plaintiff,        §
       §
VS.        §     CIVIL ACTION NO. 7:16-CV-218
       §
NANCY A. BERRYHILL,[1]        §
       §
       Defendant.        §

## REPORT AND RECOMMENDATION

Plaintiff Ruben S. Munoz, proceeding pro se, filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's denial of disability benefits. Plaintiff's application alleged that he became disabled in May 2013 due to diabetes, arthritis, high blood pressure, and high cholesterol. An Administrative Law Judge (ALJ) found that, while Plaintiff's physical conditions limited him to a restricted range of medium work, he is still capable of performing several different jobs that exist in significant numbers, and thus he is not disabled.

In challenging the Commissioner's denial of benefits, Plaintiff alleges that the Administrative Law Judge (ALJ) erred in the following ways: 1) the ALJ's residual functional capacity (RFC) determination is legally insufficient because it fails to take into account the side effects of Plaintiff's medications; and 2) the ALJ failed to properly evaluate the medical opinion

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court should substitute Nancy A. Berryhill for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

of Plaintiff's treating physician.  (Docket No. 16.)  Pending before the Court are Plaintiff's motion for summary judgment and the Commissioner's response.[2]  (Docket Nos. 15, 17.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that Plaintiff's claims lack merit.  The record shows that the ALJ's RFC findings are supported by substantial evidence, and the ALJ did not err in failing to give controlling weight to the medical opinion of Plaintiff's treating doctor.

Accordingly, for the reasons discussed further below, it is recommended that Plaintiff's summary judgment motion be denied, that the Commissioner's decision be affirmed, and that this action be dismissed.

## I.  BACKGROUND

On June 20, 2013, Plaintiff applied for Disability Insurance Benefits under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq.  (*See* Tr. 132-39.)[3] In his application, Plaintiff alleged that he became disabled on May 19, 2013, and he identified "cholesterol, high blood pressure, diabetes, [and] arthritis" as the conditions that prevented him from working.  (Tr. 137.)  Plaintiff's applications were denied initially and on reconsideration. Plaintiff then requested a hearing before an ALJ, which was held on August 27, 2014.  The ALJ

---

[2]  In her response, "the Commissioner respectfully requests that the Court AFFIRM her administrative decision and DISMISS Plaintiff's Complaint."  (Docket No. 17, at 7.)
[3]  The Commissioner has filed a transcript of the record of the administrative proceedings (Docket No. 12), which will be cited as "Tr."  The specific page of the administrative transcript will be cited by reference to the page numbers in bold typeface located in the bottom right corner of the transcript pages.

issued a written decision on November 7, 2014, finding that Plaintiff was not disabled because he was able to perform medium work that included jobs that existed in significant numbers in the national economy.  (Tr. 12-25.)

Plaintiff filed a request with the Social Security Administration's Appeals Council to review the ALJ's adverse decision.  The Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision for purposes of judicial review.  In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[4]

## A.    Education, Work Experience, and Activities

At the time of the administrative decision, Plaintiff was 59 years old.  Plaintiff obtained his GED diploma in 1978.  That same year, he went to Truck Driving School and later received a commercial driver's license (CDL).  (Tr. 152.)  In the 15-year period preceding the hearing, Plaintiff worked full time as a truck driver in different capacities.  (Tr. 153, 158.)  In his most recent employment as a truck driver, Plaintiff worked 10-hour shifts six days per week.  (Tr. 159.)  He was walking or sitting most of the day, and he would frequently have to kneel, crouch, crawl, and handle big objects.  (*Id.*)  He also frequently was required to lift objects weighing 50 pounds or more.  (*Id.*)  Plaintiff's other jobs as a truck driver were similar in nature.  (Tr. 160-62.)

When Plaintiff filed his disability application, he was living with his wife and family.  (Tr. 166.)  In his application, Plaintiff states that his wife bathes him and prepares his meals daily.  (*Id.*)  He watches television all day while he is home alone.  (*Id.*)  As far as his personal hygiene, Plaintiff is able to shave but not able to bathe or dress himself.  (Tr. 167.)  He states that

---

[4]  The Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  The undersigned has thoroughly reviewed the medical records and other evidence, which will be summarized above.

he is unable to do any chores inside or outside the home because his "severe arthritis is very painful and high blood pressure makes [him] dizzy."  (Tr. 168-69.)  He rarely goes outside due to his heat sensitivity.  (Tr. 169.)  According to Plaintiff, "watching TV is all [he] can do."  (Tr. 170.)  Plaintiff claims that he is limited to lifting objects that weigh less than 10 pounds and that he "should never squat, bend, reach, kneel, or climb stairs."  (Tr. 171.)  Plaintiff can only walk 30 feet before having to rest for three minutes due to dizziness.  (*Id.*)  He also experiences blurry vision as a side effect from his diabetes.  (*Id.*)  Plaintiff uses a cane, crutches, and a walker to help him ambulate, depending on the circumstances.  (Tr. 172.)

**B.    The Medical Evidence**

Plaintiff asserted in his application that he was disabled due to "cholesterol,[5] high blood pressure, diabetes, [and] arthritis."  (Tr. 137.)  He later alleged that other physical impairments, including dyslipidemia and ulcers, also prevented him from working.  (Tr. 151.)  This summary of the medical evidence will focus on those physical impairments that are relevant to Plaintiff's application for disability benefits.[6]

Plaintiff has a history of high blood sugar and high cholesterol, extending back to March 2007.  (Tr. 282-83.)  He continued to exhibit "out of range" cholesterol levels in late 2008 and early 2009, as well as a high "lipid panel."  (Tr. 276-80.)  Similarly, in November 2011, Plaintiff again exhibited high glucose, cholesterol, and triglyceride levels.  (Tr. 271-75.)

---

[5] Plaintiff alleges that he has been taking lovastatin for high cholesterol and Lisinopril for hypertension, both of which he began taking in 2005.  (Tr. 200.)  Lovastatin is prescribed to treat coronary heart disease and hyperlipidemia, whereas Lisinopril is prescribed to treat hypertension. NURSING 2008 DRUG HANDBOOK 305, 339 (28th ed. 2008).

[6] Most of the medical evidence relates to treatment that Plaintiff received in 2013, which is the same year that he filed the disability application at issue here.  There is some evidence that relates to earlier years.  For example, included in the medical evidence of record are doctor visits going back to August 2000, which show that Plaintiff had "borderline" hypertension, and also reflect a shoulder injury that Plaintiff suffered as a result of a "blow out" while he was driving a truck.  (Tr. 258-59.)

On November 4, 2011, Plaintiff visited Jose T. Sandoval, M.D., at the Main Family Practice Clinic.  (Tr. 262.)  Plaintiff complained of pain in multiple areas, but "especially" in his left shoulder.  (*Id.*)  Dr. Sandoval's assessment included that Plaintiff has diabetes mellitus, hypertension, and dyslipidemia.  (*Id.*)  Dr. Sandoval also planned to evaluate Plaintiff for rheumatoid arthritis.  (*Id.*)  Plaintiff returned to Dr. Sandoval on December 2, 2011, for a blood-pressure-check.  (Tr. 260.)  During this visit, Plaintiff complained that he was feeling "lighthead[ed]."  (*Id.*)  The progress notes reflect that Plaintiff's hypertension was "uncontrolled." (*Id.*)

On January 17, 2012, Plaintiff was evaluated by Dionisio B. Calvo, M.D., a doctor specializing in internal medicine.[7]  (Tr. 206.)  Plaintiff stated that his "chief concerns" were his diabetes and high blood pressure, which he described as beginning  four and two years earlier, respectively.  (*Id.*)  When asked about the symptoms related to these two conditions, the only thing Plaintiff complained of was "a burning sensation on both soles of the feet which started [ ] a year ago."  (*Id.*)  Plaintiff also mentioned that he began experiencing dizziness eight months earlier.  (*Id.*)  He said that he experiences the dizziness daily but of unknown duration; Plaintiff had difficulty describing its "frequency, duration, inciting, [or] alleviating factors."  (*Id.*)  Plaintiff stated that his "activities of daily living [were not] bothered by this dizziness." (*Id.*)

Plaintiff also mentioned his arthritis, which he has been experiencing for two years.  (Tr. 207.)  He described pain in his shoulders, feet, and left knee, as well as some left side weakness to his body.  (*Id.*)  Plaintiff stated the pain is at 6/10 during the day but "at night it is usually a 9 or 10."  (*Id.*)  He takes only over-the-counter medications to deal with the pain.  (*Id.*)  Plaintiff

---

[7]  This exam was performed at the request of the Social Security Administration and pre-dates Plaintiff's disability application at issue here.  (*See* Tr. 206 (addressing examination report to "SSA").)  It thus appears that this examination was performed in connection with a prior application.

stated that he uses a cane to assist with ambulation, but he was unable to describe when or how often he uses a cane.  (*Id.*)  He was not using a cane during his visit to Dr. Calvo.

Upon examination, Dr. Calvo found that Plaintiff "was able to sit, stand, move about, lift, carry, handle objects, . . . , dress and undress, [and] transfer from examining table and chair without any problems."  (Tr. 207.)  Plaintiff was also "able to walk on his heels, toes, tandem walk and squat[,] [and his] [h]andgrip, ability to reach, handle finger and feel was normal."  (Tr. 208.)  Notably, Plaintiff "had a peculiar way of doing range of motion, particularly on left upper girdle"; however, "[d]uring the time that he was not being examined and he did not think that he was being observed, he was not doing this peculiar manner of holding his shoulder elevating the shoulder to the neck area."  (*Id.*)  Close examination of the left shoulder was unremarkable.  (*Id.*)  After the examination was complete, Dr. Calvo diagnosed Plaintiff with diabetes, hypertension, aches and pains, "particularly in the left shoulder," foot problems, dizziness, and obesity.  (Tr. 209.)

A year later, on January 28, 2013, Plaintiff was seen by Dr. Sandoval.  His chief complaint at that time was muscle aches, although he also had symptoms of minor dizziness and intermittent blurry vision.  (Tr. 214-15.)  Upon examination Plaintiff had difficulty raising his shoulders above 90 degrees and complained of a burning sensation in his lower extremities.  (*Id.*)  Ultimately, Dr. Sandoval diagnosed Plaintiff with diabetes, uncontrolled hypertension, hyperlipidemia, diabetic neuropathy, rheumatoid arthritis, and Dupuytren's contractures.[8]  (Tr. 216-17.)

---

[8]  Dupuytren's contractures "is a disease of the palmar fascia resulting in thickening and shortening of the fibrous bands on the palmar surface of the hand and fingers resulting in a characteristic flexion deformity of the fourth and fifth digits."  STEDMAN'S MEDICAL DICTIONARY 405 (27th ed. 2000).

During this visit, Dr. Sandoval also completed a "Medical Opinion Re: Ability To Do Physical Activities," which is essentially a residual functional capacity (RFC) assessment.  (Tr. 217-19.)  Dr. Sandoval indicated that Plaintiff could continuously sit for 30 minutes at one time and continuously stand for 20 minutes at one time.  (Tr. 217.)  In an 8-hour workday, Plaintiff could sit and stand/walk for less than 2 hours.  (*Id.*)  The doctor opined that Plaintiff is "unable to work."  (*Id.*)  He found that Plaintiff could occasionally lift and carry 10 pounds or less during a work day.  (Tr. 218.)  Plaintiff also has significant limitations in doing repetitive reaching, handling, and/or fingering, and should avoid exposure to extreme heat and cold.  (Tr. 218-19.)  In addition, he can never crouch or climb ladders/stairs, and he can only occasionally twist and stoop.  (Tr. 219.)  Dr. Sandoval indicated that Plaintiff's impairments would cause him to be absent from work more than twice a month.[9]  (*Id.*)

Eight months later, on October 1, 2013, Plaintiff returned to Dr. Sandoval for a "routine check-up."[10]  (Tr. 285.)  During this visit, Plaintiff complained of "joint and muscle pain for a while."  (*Id.*)  Plaintiff denied that he was experiencing any dizziness, but stated that he has blurred vision.  (*Id.*)  He also denied that he was having difficulty walking or rising from a sitting position without assistance.  (*Id.*)  Plaintiff mentioned that the pain and burning sensation in his feet had improved.  (*Id.*)

Based on his examination, Dr. Sandoval noted that Plaintiff was "alert and oriented" and was in "no acute distress."  (*Id.*)  Plaintiff's gait was "normal," and he had "no motor or sensory deficits."  (Tr. 286.)  Noting that this was Plaintiff's first visit since January 2013 (eight months

---

[9] Dr. Sandoval also completed a "Diabetic Foot Screen," finding that Plaintiff had foot ulcers and abnormalities in his toe nails.  (Tr. 220.)

[10] Plaintiff filed his disability application on June 20, 2013, alleging that he became disabled on May 19, 2013.  On July 17, 2013, Plaintiff presented to the Dermatology Clinic of McAllen, complaining of various skin irregularities that are unrelated to the physical/medical impairments that are the basis of his disability application.  (Tr. 249-53.)

earlier), Dr. Sandoval determined overall that Plaintiff's "conditions remain unchanged."  (*Id*.)

Dr. Sandoval completed another "Ability To Do Physical Activities," and his findings regarding

Plaintiff's functional limitations were largely consistent with his previous evaluation (dated

January 28, 2013).  (Tr. 224-26.)

The next week, on October 7, 2013, Dr. Calvo examined Plaintiff again.  (Tr. 228-32.)

Plaintiff stated that his main concern was his diabetes.  (Tr. 228.)  He stated that because of his

diabetes, he experiences "dizzy blurred vision" two to three times a week.  (Tr. 229.)  Plaintiff

reported that he "has told doctors about this and was told this was secondary to high blood

pressure," but he had received no specific treatment for it.  (*Id*.)  When asked about his high

blood pressure, he again mentioned dizziness as a symptom.  (*Id*.)  However, "he was not really

able to give [ ] precipitating, worsening factors or what he does for this except for 'napping.'"

(*Id*.)  Plaintiff stated that he has "trouble taking a shower."  (Tr. 230.)

Upon physical examination, Dr. Calvo noted "painful nodularities on the palmar surface

of either hand," which "may be the Dupuytren's contractures."   (Tr. 231.)   Despite this,

Plaintiff's "handgrip ability to reach, handle, and finger feel was normal."  (*Id*.)  As to his

extremities, "[t]here was no evidence of muscle atrophy," "no loss of coordination or dexterity,"

his "[m]uscle strength both upper and lower extremities left and right were 5/5," and he "was

able to walk on his heels, toes, tandem walk, squat, and hop."  (*Id*.)  Further, his "[n]eurological

evaluation [was] grossly normal."  (*Id*.)  He displayed "normal" ranges of motion.  (Tr. 231, 235-

36.)  Plaintiff did not need assistance devices to ambulate.[11]  (*Id*.)

---

[11]  As part of the examination, Plaintiff's right knee was x-rayed, which revealed "minor degenerative changes."  (Tr. 233.)  His right hand was x-rayed as well, but it revealed a "normal examination of the osseous structures."  (Tr. 234.)

Dr. Calvo concluded that Plaintiff had diabetes and hypertension "without any history or clinical evidence of end-organ damage," as well as nodularities on the palmar surface of either hand that "could be Dupuytren's contracture."  (Tr. 231.)  Whether or not he had Dupuytren's contracture, Dr. Calvo's exam revealed that Plaintiff "was still able to make 100% grip" with normal strength in his hands.  (*Id.*)  Dr. Calvo stated that the "only aches and pains that [Plaintiff] could tell [him] is that of the hands."[12]  (Tr. 232.)

On October 8, 2013, a state agency physician, Dr. Tina Ward, reviewed Plaintiff's medical records and performed a residual functional capacity (RFC) assessment.  (Tr. 63-67.) Dr. Ward determined that Plaintiff had the ability to do the following: lift and/or carry 50 pounds frequently and 25 pounds occasionally; sit for 6 hours out of an 8-hour workday; stand or walk for 6 hours out of an 8-hour workday; and push or pull without limitation.  (Tr. 65.)  She found no other limitations.  (*Id.*)  Dr. Ward concluded that Plaintiff's alleged subjective limitations were only partially supported by objective medical evidence and that the "alleged severity and limiting effects from the impairments are not wholly supported."  (Tr. 66.)  On November 13, 2013, another state agency physician, Dr. Nancy Childs, reviewed Plaintiff's medical records. (Tr. 74-76.)  Dr. Childs agreed with the residual function capacity assessment by Dr. Ward.  (*Id.*)

On August 6, 2014, Dr. Sandoval completed an "Arthritis Questionnaire," which is basically another RFC assessment—the third such form completed by Dr. Sandoval over the course of about one and a half years.  (Tr. 254-57.)  Dr. Sandoval indicated that Plaintiff experiences insomnia, dizziness, and fatigue; the doctor also noted joint pains in his ankles, knees, neck, back, hands, elbows, and shoulders.  (Tr. 254.)  As objective findings, Dr. Sandoval

---

[12] Plaintiff states that between December 2013 and February 2014, Dr. Murillo prescribed to him three different medications: amlodipine and metoprolol for high blood pressure, and pioglitazone for diabetes.  (Tr. 49-50, 200); *see also* NURSING 2008 DRUG HANDBOOK 265, 310, 822 (28th ed. 2008).

noted joint warmth and deformity, reduced grip strength, impaired sleep, abnormal posture, tenderness, swelling, muscle spasms, and abnormal gait. (*Id.*) The pain reportedly interferes with attention and concentration "often." (*Id.*) Dr. Sandoval determined that Plaintiff was "incapable of even 'low stress jobs'." (Tr. 255.)

As with his prior two assessments, Dr. Sandoval indicated that Plaintiff could continuously sit for only 30 minutes at one time and continuously stand for 20 minutes at one time. (Tr. 255.) In an 8-hour workday, Plaintiff could sit and stand/walk for less than 2 hours. (*Id.*) The doctor opined that Plaintiff is "unable to work permanently." (*Id.*) He found that Plaintiff could occasionally lift and carry 10 pounds or less during a work day. (Tr. 256.) Plaintiff also has significant limitations in doing repetitive reaching, handling, and/or fingering, and should avoid exposure to extreme heat and cold. (Tr. 256-57.) In addition, he can never crouch or climb ladders/stairs, and he can only occasionally twist and stoop. (Tr. 257.) Dr. Sandoval indicated that Plaintiff's impairments would cause him to be absent from work more than twice a month. (*Id.*) There are no medical records reflecting any treatment that Plaintiff received from Dr. Sandoval around the time of this third RFC assessment.[13]

## C.    The Evidentiary Hearing

The ALJ held the evidentiary hearing on August 27, 2014. (Tr. 30-59.) Two witnesses testified: Plaintiff and a vocational expert, Byron J. Pettingill. Plaintiff was represented by an attorney.

---

[13] Plaintiff indicated that around this time, Dr. Sandoval increased his prescription for metformin from 500mg to 1,000 mg, and also prescribed glipizide for the first time. (*See* Tr. 38, 49, 200.) Metformin and glipizide are prescribed as an "[a]djunct to diet to lower glucose level in patients with type 2 (non-insulin-dependent) diabetes. NURSING 2008 DRUG HANDBOOK 801, 817 (28th ed. 2008).

Plaintiff was 59 years old at the time of the hearing.  (Tr. 36.)  Plaintiff's "primary occupation since 1998" has been driving 18-wheeler trucks.  (*Id.*)  He stated he can no longer drive trucks because his reaction time is poor and because he has difficulty climbing in and out of the trucks.  (Tr. 37.)  As to his medical conditions, Plaintiff stated that his diabetes is "uncontrolled," and his blood sugar is usually in the "high 200s."  (Tr. 37-38.)  Plaintiff experiences dizziness, drowsiness, and blurry vision when his blood sugar is high.  (Tr. 39.)  Plaintiff testified that he has been diagnosed with neuropathy, which results in numbness and a burning sensation in his feet.  (*Id.*)

Plaintiff explained that he experiences pain in his knees, mostly at night, and that he has fallen recently after his "knees have given out."  (Tr. 40.)  Dr. Sandoval has been treating Plaintiff for over 30 years, and he prescribed a cane to assist Plaintiff with walking.  (Tr. 40-41.)  Plaintiff also testified that his blood pressure is uncontrolled as well.  (Tr. 41.)

Plaintiff described the side effects from his medications as "dizziness, drowsiness, . . . , and blurry vision."  (Tr. 42.)  Plaintiff will get dizzy and his vision will blur when he stands up, but "it [doesn't] last long."  (*Id.*)  As to the nerve damage to Plaintiff's hands resulting from his diabetes, he is experiencing "joint deformity" in the mornings.  (Tr. 43.)  He also has difficulty gripping and picking up heavy objects.  (Tr. 43-44.)  Plaintiff further testified that he has been diagnosed with rheumatoid arthritis, which causes him pain (mainly at night) in his shoulders, back, hips, and legs.  (Tr. 45.)  At times he has difficulty reaching up high with his arms.  (Tr. 48.)  Plaintiff takes Aleve to help with the pain from his rheumatoid arthritis.  (Tr. 46.)

Plaintiff stated that he has trouble walking long distances; after walking for "half-a-block," his joints start hurting.  (Tr. 46.)  Similarly, he experiences difficulty sitting for

prolonged periods and needs to be "constantly moving."  (Tr. 47.)  Plaintiff also has difficulty

sleeping at night, typically waking up after only "five/six hours" of sleep.  (*Id.*)

The vocational expert, Mr. Pettingill, testified that Plaintiff's prior work as a "tractor-

trailer truck driver" would be considered semi-skilled work at a medium exertional level.  (Tr.

53.)  The ALJ asked the following hypothetical:

> Let's consider . . . a person of the same age, the same education and the same
> work experience, the same medium RFC . . . .  But you heard the testimony
> regarding the different medications that [Plaintiff] is taking.  Is someone taking
> those medications going to be allowed to have the driver's license that he's
> required to have in order to perform the type of work that the claimant previously
> performed?

(Tr. 53.)  Mr. Pettingill responded that "a person [can't] be taking those kinds of medications and

still driving as a commercial driver."  (*Id.*)  However, there would be "other medium jobs an

individual with that description" could perform.  (Tr. 54.)  Mr. Pettingill identified the following

three jobs:

1)  Packager: 40,000 jobs available nationally, and 2,000 regionally;

2)  Industrial cleaner: 100,000 jobs available nationally, and 4,000 regionally; and

3)  Warehouse stock clerk: 70,000 jobs available nationally, and 3,000 regionally.

(*Id.*)

Plaintiff's attorney asked Mr. Pettingill the following: if an individual was limited to

lifting less than ten pounds frequently, sitting, standing and walking less than two hours out of an

eight-hour workday, manipulate small objects only ten percent out of an eight-hour workday,

would need to avoid exposure to extreme heat or cold, could not climb ladders or stairs, and

would miss work more than twice a months, "based on this, could this particular individual . . .

do their past relevant work . . . [or] any other jobs."  (Tr. 56-57.)  Mr. Pettingill responded that

that individual would not be employable "on a competitive basis."  (Tr. 57.)

**D.      The ALJ's Decision**

The ALJ issued a thorough written decision, consisting of fourteen pages of single-spaced type.  (Tr. 12-25.)  In making his decision, the ALJ took into account the testimony that was presented at the hearing and the medical evidence in the record.  The ALJ applied the five-step method for evaluating disability claims.[14]

The ALJ first found (at Step One) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability, May 19, 2013.  (Tr. 14.)  In considering the severity of Plaintiff's impairments (Step Two), the ALJ determined that Plaintiff had the following "severe" medical impairments: "diabetes mellitus; and obesity."  (*Id*.)  The ALJ also determined that Plaintiff had the following "non-severe" impairments: "hypertension; Dupuytren's Contractures; hypercholesterolemia; and rheumatoid arthritis."  (*Id.*)  In making these determinations, the ALJ summarized the medical evidence of record.  (Tr. 15-16.)

The ALJ also found that Plaintiff's impairments were not severe enough, singly or collectively, to meet or medically equal one of the listed impairments in the regulations (Step Three).  (Tr. 16-17.)  In reaching this conclusion, the ALJ analyzed listings addressing Plaintiff's various physical conditions.   Specifically, the ALJ performed a detailed assessment of the "listing 9.00 for endocrine disorders" and "to any additional and cumulative effects of obesity." (Tr. 16-17.)   Plaintiff does not challenge the ALJ's findings in the first three steps of the disability analysis.

The ALJ next assessed Plaintiff's residual functional capacity (RFC) to do physical and mental work activities.  The ALJ made the following RFC finding: "[T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c).

---

[14]  The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section of this report, *infra* Part II.A.

However, due to the medication that the claimant takes, he is unable to obtain a driver's license." (Tr. 17.)  In making this finding, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (*Id.*)

In considering Plaintiff's symptoms, the ALJ followed the two-step process required by the regulations.  First, he considered "whether there is an underlying medically determinable physical or mental impairment(s) … that could reasonably be expected to produce the claimant's pain or other symptoms."  (*Id.*)  In addressing this inquiry, the ALJ provided a detailed summary of the medical evidence in the record.  (Tr. 18-23.)  After assessing the evidence regarding Plaintiff's impairments, the second step of the analysis required the ALJ to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning."  (Tr. 17.)  In performing this evaluation, the ALJ was required to make a finding on the credibility of Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms."  (Tr. 17-18.)

Ultimately, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his symtoms] are not entirely credible."  (Tr. 18.)  After his extensive review of the evidence, the ALJ concluded:

> The undersigned has taken the claimant's impairments, as well as his subjective complaints, into account in arriving at the residual functional capacity above. These facts in the record do not dispute that the claimant has conditions, which singly or in combination, may cause him pain and/or discomfort.  What these pieces of evidence suggest is that the claimant's symptoms may not be accurately reported, may not exist at the level of severity assumed by the claimant's testimony at hearing and may have other mitigating factors against their negative impact on the claimant's ability to engage in work activity.  The above residual functional capacity, as determined by the undersigned, gives adequate weight to the facts as determined credible.

(Tr. 22.)

The ALJ also considered the medical opinion evidence.  (Tr. 20-22)  After explaining the standard that applies in evaluating the opinion of a treating physician, the ALJ evaluated the opinion of Plaintiff's long-standing treating physician, Dr. Sandoval.  (Tr. 21.)  The ALJ did not afford his opinion controlling weight because it was not supported by the medical evidence.  (Tr. 21.)

Because Plaintiff could no longer obtain a driver's license, the ALJ found that Plaintiff "is unable to perform any past relevant work" as a truck driver (Step Four).  (Tr. 23.)  In considering whether Plaintiff could perform any other jobs in the national economy (Step Five), the ALJ relied on the testimony of the vocational expert, Mr. Pettingill.  In particular, Mr. Pettingill opined that, given the ALJ's RFC finding, Plaintiff could perform several other jobs, including a hand packager, cleaner, and/or warehouse stock clerk.  (Tr. 24.)  From this, the ALJ concluded that Plaintiff is not disabled.

## E.    Procedural History

Plaintiff sought administrative review of the ALJ's decision.   The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review.   The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g).  (Docket No. 2.)  Pending is Plaintiff's summary judgment motion in which he asserts that the ALJ's "decision is not supported by substantial evidence."[15]  (Docket No. 15.)  The issues have been briefed by the parties and will be analyzed in light of the applicable standard of review.

---

[15] As noted, the Commissioner filed a response to Plaintiff's motion for summary judgment, "respectfully request[ing] that the Court AFFIRM her administrative decision and DISMISS Plaintiff's Complaint."  (Docket No. 17, at 7.)

## II.  ANALYSIS

**A.      Standard of Review**

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that he is disabled.  42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); *see also Fraga v. Bowen*, 810 F.3d 1296, 1301 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983)).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)      whether the claimant is currently working in substantial gainful employment;

(2)      whether the claimant suffers from a severe impairment;

(3)      whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)      whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5)      whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At Steps One through Four, the burden of proof rests upon the claimant to show that he is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at Step Five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although the burden is initially on the Commissioner at Step Five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant could perform. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "Throughout the process, the ultimate burden of establishing disability remains with the claimant." *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at Step Four that Plaintiff was unable to perform his past relevant work. At Step Five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because he could perform jobs existing in significant numbers in the national economy. In light of this showing that Plaintiff could perform other work, the ultimate burden of proof remained with the Plaintiff.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Masterson*, 309 F.3d at 272. Substantial evidence is such relevant evidence as a reasonable mind might accept to support a

conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Evidentiary conflicts are for the Commissioner to resolve, not the courts. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question. *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.     Issues**

In seeking review of the Commissioner's denial of benefits, Plaintiff alleges that the Administrative Law Judge (ALJ) erred in two ways. First, Plaintiff claims that the ALJ's residual functional capacity (RFC) determination is legally insufficient because it fails to take into account the side effects of Plaintiff's medications on work activity other than driving. (Docket No. 16, at 4.) Second, Plaintiff argues that the ALJ failed to properly evaluate the medical opinion of Plaintiff's treating physician "in accordance with the regulations, Agency policy, and Fifth Circuit precedent." (*Id.* at 8.)

**C.     The ALJ's RFC Assessment**

Plaintiff's first claim is that the ALJ's RFC finding is legally insufficient because it fails to take into account the side effects of Plaintiff's medications on work activity other than driving. (Docket No. 16, at 4.) In particular, Plaintiff argues that the ALJ "plainly erred" in failing to "explain why Plaintiff's dizziness and drowsiness would not impact any other aspect of an 8-

hour workday except driving." (*Id.*)  In response, the Commissioner contends that the ALJ's

RFC finding is properly supported by objective medical evidence, including the testimony of the

vocational expert.  (Docket No. 17, at 4-5.)

In determining Plaintiff's RFC, the ALJ made detailed written findings.  (Tr. 17-23.)  In

making these findings, the ALJ summarized Plaintiff's medical treatment for his physical

conditions, and he specifically described and cited findings from numerous medical records.  For

example, the ALJ described Plaintiff's January 2012 examination by Dr. Calvo as follows:

> On January 17, 2012, the claimant attended a consultative examination with Dr.
> Dionisio Calvo (Exhibit B1F/2). The claimant reported that he had been
> diagnosed with diabetes four years prior and with high blood pressure two years
> prior to the examination. He complained of a burning sensation on both soles of
> his feet for a duration of a year and of dizziness for a duration of eight months. He
> reported that his daily activities were not bothered by the dizziness. The claimant
> reported that he developed arthritis that involved his left and right shoulders (left
> moreso than right) two years prior to the examination (Exhibit B1F/3). He also
> complained about the popliteal area on his left knee and pain on the nape. He
> complained that his left side is always weak. He reported that his pain was usually
> 9 or 10 (on a pain scale of 0-10) at night and a 6 during the day. He reportedly had
> used a cane, but could not give the examiner an idea of when and how often it was
> used. Dr. Calvo observed that the claimant was able to sit, stand, move about, lift,
> carry, handle objects, hear, speak, dress, undress, and transfer from the exam table
> and chair without any problems. He noted that there was no clinical evidence of
> any end organ damage, or of any spasm, loss of motion, atrophy, or motor or
> sensory reflex abnormalities with radicular distribution. Dr. Calvo noted that the
> claimant was able to walk on his heels, toes, tandem walk, and squat (Exhibit
> B1F/4). Handgrip and the ability to reach, handle, finger, and feel was normal.
> Upon examination, the claimant's blood pressure was 130/90. His height was 5'8"
> and he weighed 197 pounds. Snellen's eye examination was 20/20 on the left
> without corrective lenses. The claimant was able to handle a crayon and ballpoint
> pen to sign his name, date the page, and perform the pain drawing. The claimant's
> heart had a regular rhythm and normal rate without murmurs. His lungs were
> clear. Examination of his extremities revealed no contracture deformities,
> Heberden's or Bouchard's nodes, phalanges deviations, ulnar or radial deviation,
> atrophy, redness, subluxation, effusion, edema, or tenderness. Dr. Calvo noted
> that the claimant had a peculiar way of doing range of motion, particularly on the
> left girdle due to reported pain in the left shoulder. However, Dr. Calvo noted that
> this disappeared when the claimant was not being examined. Close examination
> of the left shoulder failed to show any evidence of any erythema or swelling. The
> claimant had mild tenderness there, but no subluxation, edema, effusion, or

warmth on the said area. The claimant did not complain of any pain during the exam, particularly on the foot, knees, and hip area. There was no marked lordosis or scoliosis on the lumbar spine or paravertebral muscle tenderness. Neurologically, the claimant was grossly normal. Classical, supine, straight leg raising, and sitting knee extension was negative for radiculopathy. Based upon the examination, Dr. Calvo diagnosed the claimant with diabetes and hypertension (both without any clinical evidence of end organ damage), aches and pain (particularly in the left shoulder) exact nature unknown, foot problems (exact nature unknown), dizziness (exact nature unknown), and obesity (Exhibit B1 F/5).

(Tr. 18-19.)  The ALJ provided a similarly detailed description of Plaintiff's second examination with Dr. Calvo on October 7, 2013.  (Tr. 19-20.)   Among other things, the ALJ noted the following:

[Plaintiff/Claimant] reported having dizziness and blurred vision 2-3 times per week. He reportedly told his doctors about it, but no further treatment was given for his complaints. The claimant was unable to give the examiner any precipitating, worsening factors for his dizziness or what he does for it except for "napping." Upon examination, the claimant's blood pressure was 177/87 (Exhibit B6F/4). His weight was 191 pounds. Examination notes reflect that the claimant's heart had a regular rhythm and normal rate without murmurs, rubs, or clicks (Exhibit B6F/5). He had normal breath sounds without rales. The claimant had painful nodularities on the palmar surface area of either hand, which Dr. Calvo noted might have been the Dupuytren's contractures indicated by Dr. Sandoval. There were two nodularities on the right and three on the left. The claimant complained of tenderness on palpation to them. There was no evidence of any joint effusion, erythema, tenderness, subluxation, contractures, or muscle atrophy. There was no loss of coordination or dexterity. Muscle strength in both upper and lower extremities bilaterally were 5/5. The claimant was able to walk on his heels, toes, tandem walk, squat, and hop. There was no marked lordosis or scoliosis. There was no neuro-lateralizing sign. Straight leg raising on the right and left was 50 degrees with no evidence of radiculopathy. The claimant was able to touch the tip of the digit to the tip of the toes bilaterally. Neurologic evaluation was grossly normal. Straight leg raising on classical supine and sitting in the extension was negative for radiculopathy. All ranges of motion were clinically normal. The claimant did not need assistive devices to ambulate. His handgrip ability to reach, handle, and finger feel was normal. There was no evidence recurrent ulceration, edema, stasis changes, or evidence of DVT in the lower extremities. An x-ray of the right knee revealed mild degenerative changes (Exhibit B6F/7). X-rays of his right hand revealed normal osseous structures (Exhibit B6F/8). Dr. Calvo diagnosed the claimant with diabetes and hypertension without any history or clinical evidence of end organ damage, nodularities on the palmar surface of hand that was possibly Dupuytren's contracture (however the claimant was able to still make 100% grip), and history of bleeding ulcers in the very remote past (Exhibit

B6F/5). Dr. Calvo additionally noted that the only aches and pains the claimant could tell him of was of the hands; however, there was no evidence of any joint deformity except for the Dupuytren's contracture (Exhibit B6F/6).

(Tr. 20.)

The ALJ provided a similarly detailed and accurate description of the other material medical evidence in the record. Although Plaintiff takes issue with the ALJ's ultimate conclusion that despite his impairments, he can still perform work at the medium exertional level, a review of the record shows that the ALJ accurately stated the medical findings that he relied upon in reaching his decision. Those medical records provide substantial evidence to support the ALJ's finding that Plaintiff retains the capacity to perform a restricted range of medium work.

Plaintiff suggests that the ALJ failed to consider the impact of the side effects from Plaintiff's medications—specifically, dizziness and drowsiness—on his ability to perform medium work.[16] Plaintiff is mistaken, as shown by the ALJ's written decision. The ALJ noted that in determining Plaintiff's RFC, he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." (Tr. 17.) In addition to this general statement, the ALJ's summary of Plaintiff's testimony and

---

[16]   Plaintiff's argument is based on the premise that the ALJ recognized and accepted that Plaintiff's dizziness and drowsiness result in his inability to drive. This assumption appears to overstate the ALJ's finding on this issue. At the hearing, the ALJ asked the vocational expert whether Plaintiff would be "allowed to have" a commercial driver's license given the medications he was taking. (Tr. 53.) Mr. Pettingill responded that in his experience "a person taking those kinds of medications" would not be able to obtain a commercial driver's license. (*Id.*) Accepting this expert testimony, the ALJ included the following limitation on Plaintiff's ability to perform medium work: "due to the medication that the claimant takes, he is unable to *obtain* a driver's license." (Tr. 17; emphasis added.) In other words, the limitation recognized by the ALJ resulted from the fact that Plaintiff was taking certain medications, rather than a finding that Plaintiff suffered from dizziness and drowsiness to the extent that he was unable to drive. In any event, as discussed above, the ALJ's finding that Plaintiff is able to perform other types of medium work is supported by substantial evidence.

the medical evidence reflect that he was well aware of and considered Plaintiff's subjective complaints of dizziness and drowsiness. The ALJ specifically addressed and considered the following:

- "[Plaintiff] testified that he feels dizzy and drowsy and has blurred vision when his sugar level is high." (Tr. 18.)

- "He testified that these medications cause him dizziness (when he gets up) and drowsiness. He testified that the dizziness does not stay with him for long." (Tr. 18.)

- "He complained [to Dr. Calvo] of . . . dizziness for a duration of eight months. He reported that his daily activities were not bothered by the dizziness." (Tr. 18.)

- "Based upon the examination, Dr. Calvo diagnosed the claimant with . . . dizziness (exact nature unknown)." (Tr. 19.)

- "He reported having dizziness and blurred vision 2-3 times per week. He reportedly told his doctors about it, but no further treatment was given for his complaints. The claimant was unable to give the examiner any precipitating, worsening factors for his dizziness or what he does for it except for 'napping.'" (Tr. 20.)

- "[T]he undersigned additionally considered the claimant's subjective complaints that his medication causes him the side effects of dizziness and drowsiness in limiting his ability to obtain a driver's license." (Tr. 22-23.)

After considering Plaintiff's various subjective complaints in light of the medical evidence, the ALJ determined that Plaintiff's "symptoms may not be accurately reported, may not exist at the level of severity assumed by the claimant's testimony at the hearing and may have other mitigating factors against their negative impact on the claimant's ability to engage in work activity." (Tr. 22.) Stated another way, the ALJ found that Plaintiff's subjective complaints—including dizziness and drowsiness—were not fully credible.

The ALJ's credibility finding is entitled to "considerable deference," particularly since the ALJ had the opportunity to observe Plaintiff's testimony at the hearing. *Falco v. Shalala*, 27 F.3d 160, 164 & n.18 (5th Cir. 1994) (noting that an ALJ's findings regarding a claimant's

22

subjective complaints of pain "are precisely the kinds of determinations that the ALJ is best positioned to make," particularly since the ALJ "enjoys the benefit of perceiving firsthand the claimant at the hearing"); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991) (stating that "it is within [the ALJ's] discretion to determine the pain's disabling nature" and "[s]uch determinations are entitled to considerable deference"); *see also Newton*, 209 F.3d at 459 (noting that "an ALJ's assessment of a claimant's credibility is accorded great deference" where it is supported by substantial evidence). Based on the record here, Plaintiff has fallen far short of showing that the ALJ abused his discretion in determining that Plaintiff's subjective complaints are not fully credible.[17]

Contrary to Plaintiff's argument that the ALJ's RFC is legally insufficient, there is clearly substantial evidence in the record to support the ALJ's findings regarding Plaintiff's alleged physical limitations, including any limitations resulting from the side effects from his medications. While there is evidence suggesting that Plaintiff suffers from some dizziness and drowsiness (as the ALJ acknowledged in his opinion), it is the ALJ's task to determine—based on all the evidence of record—the seriousness of those side effects and their effect on Plaintiff's

---

[17] As reflected by the ALJ's decision, the record reflects multiple circumstances that call into question Plaintiff's statements of about the extent of his subjective symptoms. For example, during a physical exam of Plaintiff's left shoulder, Dr. Calvo noted that Plaintiff had a "peculiar way of doing range of motion"; however, when "he was not being examined and he did not think that he was being observed, he was not doing this peculiar manner of holding his should elevating the shoulder to the neck area." (Tr. 208.) Dr. Calvo's close examination of Plaintiff's left shoulder showed that it was unremarkable. (*Id.*) The ALJ also noted that Plaintiff brought a cane to the evidentiary hearing and stated that Dr. Sandoval had prescribed it. (Tr. 18.) In his June 2013 disability application, Plaintiff claimed to use a cane, crutches, and a walker to help him ambulate; he also stated that his wife bathes him and that he cannot dress himself. (Tr. 172.) However, Dr. Calvo observed during his examinations of Plaintiff in January 2012 and October 2013 that Plaintiff had a normal gait and was able to move about, that he was able to dress and undress, that he had a normal range of motion, and that he had normal strength and grip. (Tr. 207-08, 230-31.) Dr. Calvo noted: "Clinically, the [Plaintiff] does not need assistive devices to ambulate." (Tr. 231.)

ability to perform work-related activities.   Because the ALJ's RFC finding is supported by substantial evidence in the record, Plaintiff's challenge to that finding lacks merit.

**D.      The ALJ's Consideration of Medical Opinion Evidence**

Plaintiff claims that the "ALJ erred by failing to evaluate the opinions of Plaintiff's treating specialist in accordance with the regulations, Agency policy and Fifth Circuit Precedent."  (Docket No. 16, at 8.)  Specifically, Plaintiff argues that his primary treating source, Dr. Sandoval, "establishes far greater limitations than reflected in the ALJ's RFC finding," and that the ALJ erred when he "failed to address numerous [20 C.F.R.] § 404.1527(c) factors that are plainly relevant to Dr. Sandoval's opinions."  (*Id.* at 9-16.)  The Commissioner contends that the ALJ properly considered Dr. Sandoval's opinions under the regulations.  (Docket No. 17, at 5-7.)

1.  Dr. Sandoval's Opinions

Dr. Sandoval completed three separate RFC assessment forms, all three of which are largely consistent, if not identical.  (Tr. 217-19, 224-26, 254-57.)  Dr. Sandoval's RFC findings are dated January 28, 2013, October 1, 2013, and August 6, 2014, respectively.  Dr. Sandoval found that Plaintiff has extreme limitations in his ability to perform work-related activities.  For example, Dr. Sandoval indicated that Plaintiff could continuously sit for only 30 minutes at one time and continuously stand for 20 minutes at one time.  (*See* Tr. 217.)  In an 8-hour workday, Plaintiff could sit and stand/walk for less than 2 hours.  (*Id.*)  Plaintiff could occasionally lift and carry 10 pounds or less during a work day.  (Tr. 218.)  Dr. Sandoval further opined that Plaintiff is "unable to work." [18]  (Tr. 217.)

---

[18]   Plaintiff highlights Dr. Sandoval's opinion that Plaintiff is "unable to work" and "unable to work permanently."  (Docket No. 16, at 10; *see also* Tr. 217-18, 224-26, 255-57.)  However, while Dr. Sandoval's opinion about the nature and severity of Plaintiff's physical condition is

It is clear that the ALJ was required to consider Dr. Sandoval's opinion about Plaintiff's work-related physical limitations.  20 C.F.R. § 404.1527(b); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).[19]   A medical opinion from a treating doctor will be accorded "controlling weight" where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2).  Where the treating doctor's opinion is not given controlling weight, an ALJ will "apply the factors listed" in the regulations "in determining the weight to give the opinion."[20]  *Id*.  The ALJ must "give good reasons" for the weight given to treating doctors' opinions.  *Id*.

In applying these regulatory requirements, the Fifth Circuit has "long held that 'ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the

---

entitled to consideration and deference, his opinion about whether Plaintiff is "disabled" is irrelevant and entitled to no weight.  *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) ("Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'").  The determination of whether a claimant is disabled is a legal conclusion that is "reserved to the Commissioner."  *Id*. (citing 20 C.F.R. § 404.1527(e)(1)); *see also Miller v. Barnhart*, 211 F. App'x 303, 305 (5th Cir. 2006) ("We do not require that an ALJ justify a decision to give little weight to a physician's opinion that a patient is disabled or unable to work, because such decisions are reserved for the Commissioner.") (citing *Frank*, 326 F.3d at 620).

[19] Under the regulations, medical opinions are defined as follows:

> Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

[20] The factors to be considered under the regulations include the following: 1) the length of the treatment relationship and the frequency of examination; 2) the nature of the treatment relationship; 3) whether the physician presents relevant medical evidence and explanations in support of an opinion, 4) whether the opinion is consistent with the record as a whole; 5) the specialization of the physician; and 6) any other factors that the claimant or others bring to the ALJ's attention.  *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(c)(6); *see also Newton*, 209 F.3d at 456.

claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability.'" *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985)); *see also Newton*, 209 F.3d at 455 (noting that the opinions of treating doctors are generally to be accorded "great weight").   "The treating physician's opinions, however, are far from conclusive."   *Greenspan*, 38 F.3d at 237.

Ultimately, "the ALJ has sole responsibility for determining a claimant's disability status," and "the ALJ is free to reject the opinion of *any* physician when the evidence supports a contrary conclusion." *Newton*, 209 F.3d at 455 (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)) (emphasis added).   Even the opinions of treating physicians "may be assigned little or no weight when good cause is shown." *Newton*, 209 F.3d at 455–56.   Good cause exists when a treating source's opinion is conclusory, unsupported by medically acceptable evidence, or is otherwise lacking substantial support.   *Id*. at 456.   "[T]he ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" *Greenspan,* 38 F.3d at 237 (quoting *Scott,* 770 F.2d at 485).

Here, it is clear that the ALJ understood the correct standard in considering Dr. Sandoval's medical opinion.  The ALJ explained this standard in his decision:

> Generally, more weight is afforded to the opinion of a treating source as the treating source is most often in the best position to provide a detailed, longitudinal picture of the claimant's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings or one-time examinations (20 CPR 404.1527). If a treating source's medical opinion is well-supported and consistent with the other substantial evidence in the case record, it must be given controlling weight (20 CPR 404.1527, and SSR 96-2p ). When a treating source opinion is not afforded controlling weight, the following factors will be considered: the length of the treatment relationship and the frequency of treatment, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion, any relevant specialty of the treating source, and other relevant factors (20 CPR 404.1527).

(Tr. 21.)

In applying this standard, the ALJ explained why he afforded Dr. Sandoval's opinions

little weight:

> Although the undersigned concedes that the claimant has had a lengthy treatment history with Dr. Sandoval, there is not much evidence within the record to support consistent medical treatment during the relevant time period (since the claimant's alleged onset date of May 19, 2013). The undersigned finds that the limited objective medical evidence within the record that occurred during the relevant time period does not support the stringent limitations outlined in Dr. Sandoval's opinions.

(Tr. 21.)

Thus, the ALJ did not give controlling weight to Dr. Sandoval's opinions about

Plaintiff's functional limitations because the limited medical evidence did not reflect that

Plaintiff had received consistent treatment during the relevant period and because that limited

medical evidence did not support the extreme limitations reflected by Dr. Sandoval's opinions.

Such findings, if supported by substantial evidence, constitute good cause for the ALJ to give Dr.

Sandoval's opinion little weight.  *See Newton*, 209 F.3d at 456.

The issue here is not whether Dr. Sandoval's opinions are consistent with some medical

evidence in the record.  Rather, it is whether there is substantial evidence to support the ALJ's

finding that the doctor's opinion was inconsistent with the medical evidence.  *See Williams v.*

*Colvin*, F. App'x 350, 354 (5th Cir. 2014) (affirming summary judgment in favor of the

Commissioner where "there is substantial evidence in the record to justify the ALJ's decision to

give less weight" to the treating psychiatrist's opinion).  While it is true that the record includes

some evidence that would tend to support both Dr. Sandoval's opinion in particular and

Plaintiff's disability claim in general, there is also substantial evidence that supports the ALJ's

decision to give little weight to the doctor's opinion and to deny Plaintiff's application.  *See*

27

*Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (although there may be "some evidence that points to a conclusion that differs from that adopted by the ALJ," reversal is not appropriate where the ALJ's finding is supported by "more than a scintilla of evidence").

As an initial matter, Plaintiff has had a treating physician relationship with Dr. Sandoval for approximately 30 years.  (*See* Tr. 40-41.)  The ALJ recognized as much.  (Tr. 21 ("[T]he undersigned concedes that the claimant has had a lengthy treatment history with Dr. Sandoval.").)  However, as the ALJ also pointed out, "there is not much evidence within the record to support consistent medical treatment during the relevant time period (since the claimant's alleged onset date of May 19, 2013)."  (Tr. 21.)  The record supports the ALJ's finding on this issue.

The medical record reflects that Plaintiff visited Dr. Sandoval only once after Plaintiff's alleged disability onset date.[21]  (Tr. 285-86 (office visit dated October 1, 2013).)  Plaintiff's visit to Dr. Sandoval on October 1, 2013, occurred over four months after his alleged disability onset date, and it was the first time that he had seen Dr. Sandoval in over eight months (since January 28, 2013).  The other medical records from Dr. Sandoval span the following years:

- 2000-2001 (Tr. 258-59 (office visits related to a Worker's Compensation claim));

- 2006-2009 (Tr. 268, 276-84 (lab work));

- 2007-2009 (Tr. 263-67 (progress notes from approximately 12 visits));

- November 2011 (Tr. 269-75 (lab work));

- November 2011-December 2011 (progress notes from three visits)).

Plaintiff's limited treatment history tends to support the ALJ's assessment of Dr. Sandoval's opinions.

---

[21] Although Dr. Sandoval completed an RFC form on August 6, 2014, there are no records of any examination or treatment on that date.

In finding that the objective medical evidence did not support Dr. Sandoval's opinions about the extent of Plaintiff's limitations, the ALJ described this evidence in his decision:

> The undersigned finds that the limited objective medical evidence within the record that occurred during the relevant time period does not support the stringent limitations outlined in Dr. Sandoval's opinions. He was noted to be overweight, but well developed and in no acute distress (Exhibit B12F/28). His heart had a regular rate and rhythm with normal heart sounds and no murmurs, rubs, gallops, or clicks (Exhibit B12F/29). His lungs were clear to auscultation and percussion. The claimant had a normal gait with no motor or sensory deficits, clubbing, cyanosis, or edema. His cranial nerves were intact and he had a normal sensory exam. His deep tendon reflexes were symmetrical and equal bilaterally. During the claimant's October 2013 consultative examination, there was no evidence of any joint effusion, erythema, tenderness, subluxation, contractures, or muscle atrophy (Exhibit B6F/5). There was no loss of coordination or dexterity. Muscle strength in both upper and lower extremities bilaterally were 5/5. The claimant was able to walk on his heels, toes, tandem walk, squat, and hop. There was no marked lordosis or scoliosis. There was no neuro-lateralizing sign. Straight leg raising on the right and left was 50 degrees with no evidence of radiculopathy. The claimant was able to touch the tip of the digit to the tip of the toes bilaterally. Neurologic evaluation was grossly normal. Straight leg raising on classical supine and sitting in the extension was negative for radiculopathy. All ranges of motion were clinically normal. The claimant did not need assistive devices to ambulate. His handgrip ability to reach, handle, and finger feel was normal. There was no evidence of recurrent ulceration, edema, stasis changes, or evidence of DVT in the lower extremities. None of these objective findings support an inability to work or the functional limitations set forth in Dr. Sandoval's opinions. As such, the undersigned affords them little weight.

(Tr. 21.)

The ALJ accurately described the medical records that supported his finding. For example, the record of Plaintiff's October 1, 2013, visit to Dr. Sandoval reflects that Plaintiff denied that he was having any difficulty walking or "rising from [a] sitting position without assistance." (Tr. 285) Upon examination, Dr. Sandoval noted the following negative objective findings:

- Overweight but well developed;

- Regular heart rate and rhythm;

- Clear lungs;

- Normal gait;

- No motor or sensory deficits; and

- Deep tendon reflexes which were symmetrical and equal bilaterally.

(Tr. 285-86.)

Such objective findings are arguably inconsistent with the severe limitations reflected by Dr. Sandoval's physical RFC assessments, which appear to be based on a wholesale acceptance of Plaintiff's subjective statements about his condition and limitations. The ALJ's assessment of Dr. Sandoval's opinion is also supported by Dr. Calvo's examination findings. As described earlier in this report, Dr. Calvo's examinations revealed that Plaintiff "was able to sit, stand, move about, lift, carry, handle objects, … dress and undress, [and] transfer from examining table and chair without any problems." (Tr. 207.) Dr. Calvo observed that Plaintiff had normal muscle strength, normal grip, normal coordination and dexterity, and normal range of motion. (Tr. 231.) In addition, the opinions of the state agency medical consultants, Drs. Ward and Childs, further support the ALJ's assessment of Dr. Sandoval's opinion.[22] (Tr. 63-67, 74-76.) Based on the medical evidence, they opined that Plaintiff could perform work at a medium exertion level. (*Id.*)

---

[22] The regulations explain that the state agency consultants "are highly qualified" physicians and psychologists "who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). As such, the ALJ "must consider findings of State agency medical and psychological consultants . . . as opinion evidence," except on the ultimate issue of disability. *Id.* Here, the ALJ accorded the state agency doctors' opinions greater weight because "there is no objective evidence within the record to support the claimant's inability to handle such exertion, and the undersigned finds their opinion adequately considers the claimant's subjective complaints." (Tr. 22.) For the reasons already discussed, this conclusion is supported by substantial evidence in the record.

30

Although there may be some evidence to support Dr. Sandoval's opinion, the ALJ is "entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Greenspan*, 38 F.3d at 237; *see also Williams v. Colvin*, 575 F. App'x 350, 355 (5th Cir. 2014) (finding substantial evidence to justify the ALJ's decision to accord treating doctor's opinion less weight where, among other things, he appeared "to unduly rely upon [the claimant's] subjective history"). As shown above, the ALJ's reasons for giving little weight to Dr. Sandoval's opinions are clearly supported by substantial evidence. Because the ALJ had good cause to give little weight to Dr. Sandoval's opinion, Plaintiff's argument lacks merit.

### 2. The § 404.1527(c) Factors

Plaintiff also argues that the ALJ erred when he "failed to address numerous [20 C.F.R.] § 404.1527(c) factors that are plainly relevant to Dr. Sandoval's opinions." (Docket No. 16, 14-16.) Plaintiff is correct that the regulations require that the ALJ must "consider" the § 404.1527(c) factors. *See supra* n.21 (listing factors). In his decision, the ALJ stated that he "considered the opinion evidence within the record in assessing the claimant's residual functional capacity," and he listed the § 404.1527(c) factors that must be considered "[w]hen a treating source opinion is not afforded controlling weight." (Tr. 20-21.) The ALJ was thus fully aware of the requirement that he weigh all of the § 404.1527(c) factors, and he represented (at least implicitly) that he did so in considering Dr. Sandoval's opinion.

The ALJ's assessment of Dr. Sandoval's opinion addresses two key § 404.1527(c) factors: supportability and consistency (Tr. 20-21). *See* 20 C.F.R. § 404.1527(c)(3), (4). The ALJ's review of the evidence also reflects that he was aware of and took into account the length of the treatment relationship and the frequency of examination. *See* 20 C.F.R. §

404.1527(c)(2)(i).   As several courts in the Fifth Circuit have recognized, "the regulations require only that the Commissioner 'apply' the factors"; the "ALJ need not recite each factor as a litany in every case." *Johnson v. Astrue*, No. 3-08-CV-1488-BD, 2010 WL 26469, at *3-4 (N.D. Tex. Jan. 4, 2010); *see also Quintanilla v. Colvin*, Civ.A. No. V-12-044, 2015 WL 5572872, at *10 (S.D. Tex. Sept. 22, 2015) (holding that it was "evident" from the ALJ's decision that he considered the § 404.1527(c) factors, "[a]lthough the ALJ may not have clearly delineated his discussion of these factors"); *Holland v. Soc. Sec. Admin.*, No. Civ.A. 14-1202, 2015 WL 2341605, at *9 (E.D. La. May 14, 2015) (citing *Johnson v. Astrue* with approval and finding that the ALJ adequately applied the § 404.1527 factors, "[a]lthough not in formal fashion," when he "discussed the medical evidence in detail to make his findings"); *but see Bentley v. Colvin*, No. 13-CV-4238-P, 2015 WL 5836029, at *9 (N.D. Tex. Sept. 30, 2015) (holding that the ALJ committed harmless error in failing to apply "the required six-factor analysis" where the ALJ failed to even identify the treating doctor).   Here, there is no reasonable basis upon which the Court should conclude that the ALJ failed to apply all of the relevant factors, even though he did not specifically discuss each factor in turn.

Even if the ALJ in this case erred in failing to recite each factor, the error was harmless. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (applying harmless error analysis in the disability benefits context).   Procedural errors are prejudicial and warrant a remand "only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen,* 864 F.2d 333, 335 (5th Cir. 1988).   Plaintiff has failed to show any reason to believe that the result would have been different had the ALJ specifically addressed each of the § 404.1527(c) factors.   Plaintiff emphasizes that Dr. Sandoval has been treating him for 20 to 30 years (Docket No. 16 at 14), but it is clear that the ALJ was well-aware

of this fact and took it into account.  (Tr. 21 (acknowledging that Plaintiff "has had a lengthy treatment history with Dr. Sandoval").

In sum, the ALJ gave "good reasons" that constitute "good cause" for assigning little weight to Dr. Sandoval's opinion.  *See* 20 C.F.R. § 404.1527(c)(2); *Newton*, 209 F.3d at 455-56. Those same reasons support the ALJ's decision to accord greater weight to the opinions of Drs. Ward and Childs.  *See supra* n.22.  Because there is substantial evidence supporting the ALJ's assessment of the medical opinion evidence, those determinations should be affirmed.

### III.  CONCLUSION

For the foregoing reasons, the undersigned recommends that Plaintiff's Motion for Summary Judgment (Docket No. 15) be DENIED, that the Commissioner's decision be AFFIRMED, and that this action be DISMISSED.

Due to the detailed medical information summarized in this report, it is **ORDERED** that the Clerk shall file this Report and Recommendation under **SEAL**.

### NOTICE TO THE PARTIES

The Clerk shall send copies of this Report and Recommendation to the parties who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on November 14, 2017.

Peter E. Ormsby
United States Magistrate Judge